UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Laquita T. Simmons, | ) | Civil Action No. 5:19-2678-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew Saul, Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local

Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's

petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain

judicial review of the final decision of the Commissioner of Social Security ("Commissioner")

denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income

("SSI") pursuant to the Social Security Act ("the Act"). Having carefully considered the parties'

submissions and the applicable law, the court reverses and remands the Commissioner's decision

for expedited action for the reasons discussed herein.

I.      Relevant Background

        A.  Procedural History

        This is the second time the undersigned has considered Plaintiff's appeal of the

Commissioner's decisions regarding her July 30, 2014[1] applications for DIB and SSI; Plaintiff

alleges a disability-onset date of March 17, 2014. Tr. 197-212. Her applications were denied

initially, Tr. 87-89, and upon reconsideration, Tr. 124-27. Plaintiff requested a hearing by an

---

[1] Although Plaintiff's applications are dated July 29, 2014, Plaintiff's Disability Determination
and Transmittals indicate a protective filing date of July 30, 2014. Tr. 87, 124.

Administrative Law Judge ("ALJ"), Tr. 143-44, and on February 11, 2016, a hearing was held before ALJ Edward T. Morriss. Tr. 38-61. On March 21, 2016, the ALJ issued a decision finding Plaintiff was not disabled, Tr. 17-32, and Plaintiff sought review by the Appeals Council, Tr. 13-15. After the Appeals Council denied the request for review, Tr. 1-6, Plaintiff appealed the unfavorable decision to the United States District Court of South Carolina and obtained an order, filed January 16, 2018, reversing the Commissioner's decision and remanding the case for further administrative action, Tr. 878-79.[2] Based on the court's order, on March 23, 2018, the Appeals Council vacated the ALJ's final decision and remanded the matter back to the ALJ for further consideration. Tr. 882-86. Judge Morriss conducted a second administrative hearing on April 10, 2019, at which Plaintiff, who was represented by counsel, testified. Tr. 817-35. On July 8, 2019, the ALJ issued an unfavorable decision finding Plaintiff was not disabled from March 17, 2014 through the date of the decision. Tr. 791-816. Plaintiff appealed the final decision to this court in a Complaint filed on September 23, 2019. ECF No. 1.

B. Plaintiff's Background

Plaintiff was born in September 1982, and was 31 years old as of her alleged onset date of March 17, 2014. Tr. 242. Plaintiff completed the twelfth grade and has not completed any type of specialized job training, trade, or vocational school. Tr. 247. Plaintiff's past relevant work ("PRW"), from April 2005 through March 2014, was as a warehouse worker. *Id.* Plaintiff indicated she stopped working on March 17, 2014, due to her medical conditions of anxiety, depression, ulcers – abdominal pain, brain tumor – no feeling in middle of head, seizures, and headaches. Tr.

---

[2] The undersigned magistrate judge recommended Plaintiff's case be remanded to the ALJ for further analysis of a treating physician's opinion and for reassessment of Plaintiff's severe impairments, residual functional capacity (RFC), and credibility. Tr. 862-79. Neither party filed objections to the Report and Recommendation and the district judge adopted it in its entirety. Tr. 878-79. *See Simmons v. Comm'r*, 5:16-cv-2893-TMC (D.S.C.).

246-47. In a Disability Report – Appeal dated November 24, 2014, Plaintiff indicated a change in her condition and described "more headaches and anxiety and memory loss, vision getting worse[.]" Tr. 281. In a second Disability Report – Appeal dated May 7, 2015 Plaintiff indicated other changes to her conditions noting: "My seizures and vision are not getting any better. I still can't concentrate and have headaches that are much worse that stop me from even moving. There is no feeling in the middle of my head. Also my anxiety has gotten to the worse it has ever been." Tr. 291. Plaintiff also noted that her brain tumor and cancer had recently come back and her "brain has swelling in it." *Id.* Plaintiff indicated that "[w]ith all these conditions I can't even get out of my house or have enough energy or time to do a job. The cancer and brain tumor really have taken a toll on me physically and mentally." Tr. 295.

C.  Plaintiff's Second Administrative Hearing

Plaintiff and her counsel appeared at her second administrative hearing on April 10, 2019. Tr. 817-35. There were no other witnesses at the hearing. *Id.* In response to questions from the ALJ, Plaintiff testified that she was 36 years old and had completed school through the 12th grade attending regular classes. Tr. 41.

Plaintiff's counsel noted he had not been her counsel during her first administrative hearing but that he would not ask the same questions that had been asked of her in that hearing. Tr. 821.[3] Plaintiff testified she had not worked at all since March of 2014 and that she was living with her mother and stepfather, who were assisting her financially. Tr. 822. Plaintiff confirmed that her doctors continued to keep an eye on her brain tumor because they had not been able to remove all

---

[3] As the ALJ noted in his most recent decision Plaintiff "has a history of a left frontal brain tumor and she underwent a craniotomy in June 2013." Tr. 797. At Plaintiff's earlier hearing she testified that the tumor had been discovered after her complaints of migraine headaches and that, since the surgery, the tumor had returned and she had headaches about two to three times a week. Tr. 57-58. The full transcript of Plaintiff's earlier administrative hearing testimony is available at Tr. 38-61.

of it. She noted there had not been any increase in size according to the recent MRIs. *Id.* Counsel asked her whether the headaches she had been having had changed at all since the prior (February 2016) hearing. Tr. 822. Plaintiff indicated that the headaches had changed, noting things had become more stressful for her, which caused more headaches. Tr. 822-23. Plaintiff did not recall what had become more stressful. Tr. 823. Plaintiff testified that she had a "migraine headache, a severe headache" almost every other day. Tr. 823. Plaintiff indicated that, on days she had headaches, she typically had throbbing, numbing pain that began in the morning. Tr. 823. She said she felt the pain mainly on the left side of her head. *Id.* Once she felt the pain she would take either Motrin or prescribed oxycodone and then have to "lie down for at least any hour." *Id.* Plaintiff further described the pain as sometimes making her nauseated and sensitive to light, which caused her to need to lie down in a darkened room. Tr. 823-24. Plaintiff explained that it typically took about half of a day for her to recover from her headaches. Tr. 824. Plaintiff also indicated that stress and fear over medical and financial matters sometimes made the headaches worse. Tr. 824. She indicated she worries constantly about what will happen with her tumor. Tr. 824. Her doctors, including her psychiatrist Dr. Kochar[4] and her primary care physician Dr.[Keith] Lackey, have advised Plaintiff to practice breathing techniques in combination with medication to treat the headaches. Tr. 825. Plaintiff noted the medication and breathing did not help keep her from having headaches. Tr. 825.

Regarding Plaintiff's depression and anxiety, she indicated she had recently been switched to a different medication, Wellbutrin, which was working "somewhat" to help her with depression. Tr. 825. She noted, though, that she continued to have symptoms. *Id.* Plaintiff indicated she was

---

[4] "Dr. Kochar" is the phonetic spelling in the administrative transcript. This may be a reference to psychiatrist Sarah Coker, M.D., who began treating Plaintiff in August 2016 upon referral from her primary care provider. *See* Tr. 1074-1106.

unable to concentrate after the brain surgery and her anxiety caused issues relating to other people. She said she had panic attacks when she was around a crowd of people. Tr. 826. Plaintiff indicated she was not going to church or other social activities as much as she had been. Tr. 826-27. Plaintiff indicated she had tried to be a part of an exercise group for others with cancer, but she stopped going, noting the program "became too much" and it "stopped a week later[.]" Tr. 87. Plaintiff elaborated that it would have been difficult for her to do the different exercises in an overcrowded gym. Tr. 827.

When asked about her ongoing medical care, Plaintiff indicated she saw her primary care doctor and her psychiatrist every two to three months and she had periodic MRIs. Tr. 828. Plaintiff indicated she had been seeing Dr. Lackey since the beginning of issues with the tumor—from about 2013 or 2014. Tr. 828. Plaintiff noted Dr. Lackey also tracked Plaintiff's care by other providers. Tr. 828. Plaintiff indicated her oncologist had been Dr. [Ashley] Sumrall; however, Dr. Sumrall had gone to North Carolina and referred Plaintiff to a new oncologist and neurologist. Tr. 828. Plaintiff noted she had spent "pretty much an entire day" being evaluated by Dr. [Gordon] Teichner [phonetically spelled "Tightner" in transcript] and his staff for an evaluation. Tr. 828-29. In addition to testing Dr. Teichner spent time interviewing Plaintiff. Tr. 829. Plaintiff recalls she had not spent as long with other psychologists to whom she had been sent in 2014 and 2015 (Dr. Spivey and Dr. McClain). Tr. 829. In responding to her attorney Plaintiff summarized her overall state of health as being "about the same" as it had been several years ago. Tr. 829.

The ALJ asked Plaintiff questions, beginning by asking her to describe a "typical day" when she was "not having the headaches." Tr. 830. Plaintiff responded that she would wake up around 7 or 8:00 a.m., take her medications, fix breakfast, take a shower, and try to do some chores—such as cleaning her room, folding her clothes, or doing dishes. Tr. 830. Plaintiff said her mother did the laundry otherwise. Tr. 830. Plaintiff said she watched TV a little bit, but did not

read anymore. Tr. 830-31. She said she used to read a lot but that required concentration. Tr. 831. Plaintiff also indicated sometimes she would also spend time with her sisters and nephews when they came to visit. Tr. 831.

The ALJ also asked about Plaintiff's headaches, inquiring whether she had "migraines or are they just headaches that feel like migraines?" Tr. 832. Plaintiff responded that she thought they were the same thing but that she had migraines—"really strong and throbbing." Tr. 832. The ALJ asked whether Plaintiff had been prescribed Imitrex, and she said she had not. Tr. 832.

Plaintiff indicated she was 5'7" tall and weighed 285 pounds, which was more than the approximately 200 pounds she weighed when she last worked. Tr. 832. Plaintiff testified she believed her excess weight affected what she was able to do, including impacting her ability to walk for a long period or to climb steps. Tr. 833.

The hearing concluded with a colloquy between counsel and the ALJ concerning several exhibits. Tr. 833-35.

II.  Discussion

    A.  The ALJ's Findings

In his July 8, 2019 decision, the ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2019.

2.  The claimant has not engaged in substantial gainful activity since March 17, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: brain tumor status post craniotomy; headaches; depression; and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments

in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: never climb ladders, ropes, or scaffolds; avoid all exposure to hazards and concentrated exposure to noise; understand, remember, and carry out only simple instructions; and no ongoing public interaction.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on September 30, 1982 and was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from March 17, 2014, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 796-93, 808-09.[5]

B.  Legal Framework

1.  The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

---

[5] The only difference between the ALJ's findings in his second decision and the earlier decision is that the second decision includes headaches as a severe impairment. *Cf.* Tr. 22-23, 25, 30-31.

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[6] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520, § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[6] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii); § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

A claimant is not disabled within the meaning of the Act if he/she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. § 404.1520(a), (b); § 416.920(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146. n.5 (regarding burdens of proof).

## 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d

846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 428 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

III.    Analysis

Plaintiff asserts that (1) the ALJ erred by improperly weighing the medical opinion evidence of treating physicians Dr. Sumrall and Dr. Lackey and consulting examiner Dr. Teichner; (2) the ALJ issued a mental residual functional capacity ("RFC") finding that failed to properly incorporate limitations within the credited medical source opinion and that was unsupported by substantial evidence in the record; and (3) the ALJ failed to properly evaluate Plaintiff's subjective allegations. Plaintiff seeks remand for an award of benefits or, alternatively, remand for a reassessment of Plaintiff's RFC, considering all medical opinions, a reassessment of Plaintiff's subjective complaints, and consideration of vocational witness testimony. Pl. Br. 1, 47, ECF No. 17; *see also id*. at 31 (alleging harmful error based on the ALJ's failure to "summon a vocational expert to provide testimony regarding the vocational impact of any headache-related non-

exertional impairment, such as time off task/absent or any mental impairments[.]"). The Commissioner responds that the ALJ's decision appropriately considered the record evidence, including opinion evidence, and the decision is supported by substantial evidence. Def. Br., ECF No. 20.

A.  Consideration of opinion evidence

Plaintiff first alleges error in the ALJ's consideration and weighing of the medical opinion evidence. Plaintiff alleges the ALJ erred by discounting the opinions of treating physicians Dr. Sumrall and Dr. Lackey and examining/consulting neuro-psychologist Dr. Teichner. Pl. Br. 29-37. In addition, Plaintiff alleges the ALJ erred by failing to consider the court's prior findings in discounting Dr. Sumrall's opinion. *Id.* at 31-32. The Commissioner disagrees, arguing the ALJ appropriately considered and discounted portions of the opinions of Dr. Sumrall, Dr. Lackey, and Dr. Teichner based on all record evidence. Def. Br. 15-20.

1.    Opinion evidence

In considering Plaintiff's challenge to the ALJ's consideration of the opinion evidence the court first sets out the various opinions in the record. For those from treating sources—Dr. Sumrall and Dr. Lackey—the court also sets out relevant medical history with those providers.

a.    Treating physicians

i.  Treatment by neuro-oncologist, Ashley Sumrall, M.D.

Plaintiff saw Dr. Sumrall on March 17, 2015 for what was noted to be a follow-up appointment. Tr. 703.[7] Dr. Sumrall noted that she continued to treat Plaintiff subsequent to her

---

[7] The March 17, 2015 treatment note indicates it is a follow-up appointment, references prior appointments, and indicates Plaintiff had her initial visit with RSFH [Roper St. Francis Hospital] Neuro-Oncology clinic on November 5, 2013. Tr. 703. However, the record does not seem to contain treatment notes from Dr. Sumrall prior to March 17, 2015.

June 2013 craniotomy. Tr. 703. Dr. Sumrall noted Plaintiff had missed some appointments and that, at her last visit she had been experiencing sadness. Plaintiff had attempted suicide and medications had been changed. Plaintiff noted infrequent panic spells and occasional headaches, described as "sharp and shooting." Tr. 703. Plaintiff indicated she took Excedrin for the headaches and was not experiencing nausea, photophobia, or balance issues. Tr. 703. Dr. Sumrall noted Plaintiff had poor short-term memory and issues with attention span. Tr. 704. Upon examination, Dr. Sumrall noted Plaintiff had a "depressed affect" and was "[t]earful when discussing recent past." Tr. 705. Plaintiff was noted to be "doing well from tumor standpoint," was tolerating the seizure medications of dilantin and Keppra well, and indicated Plaintiff's psychiatrist could consider a different seizure medication. Tr. 706. Dr. Sumrall noted Plaintiff's headaches seemed to be infrequent at that time, sporadic use of NSAIDS was appropriate, and Plaintiff was to advise of any change in pattern. Tr. 706. Dr. Sumrall reviewed with Plaintiff that "depression is often a symptom associated with brain tumors." Tr. 706.

Plaintiff returned to Dr. Sumrall on April 28, 2015, and Dr. Sumrall noted that Plaintiff's infrequent panic spells and depressive symptoms were better. Tr. 700. Plaintiff reported that, since her last visit she has "increasing frequency and severity of headaches" that are "deep, aching and associated with left scalp tenderness. She also has left blurred vision and eye dryness. The [headaches] sometime[s] wake her from sleep and/or make going to sleep difficult." Tr. 700. Plaintiff said she did not have "concurrent nausea, photophobia, phonophobia." Tr. 701. Plaintiff indicated she had ongoing difficulty with short-term memory and attention span. Tr. 701. Upon examination, Dr. Sumrall noted that Plaintiff's "left arm and leg seem a little weaker today than they have been" and noted an ongoing depressed affect with tearfulness. Tr. 701, 702.

At the May 12, 2015 treatment visit, Plaintiff notified Dr. Sumrall that she had stopped seeing her regular therapist because of insurance changes. Tr. 689-90. Plaintiff indicated her panic

spells were infrequent and "better," her depressive symptoms also seemed "better," but she was still having crying spells. Tr. 690. Plaintiff continued to report poor short-term memory and struggling with her attention span. Tr. 690. Dr. Sumrall noted that Plaintiff had been given a trial of Amerge, which resulted in some improvement of headaches, although Plaintiff still continued taking NSAIDs. Tr. 690. Plaintiff described her headaches as "deep, aching and associated with left scalp tenderness." Tr. 690. Plaintiff did not describe having blurred vision or eye dryness and denied having concurrent nausea, photophobia, phonophobia. Tr. 695. Plaintiff still struggled with short-term memory and attention span. Tr. 690. Plaintiff's left arm and leg seemed stable, "maybe even better." Tr. 690. Plaintiff was prescribed Amerge 1 mg for migraine headaches. Tr. 690-91. Dr. Sumrall noted that Plaintiff's "course has been complicated by psychological issues." Tr. 692. The tumor was clinically stable, and Plaintiff was "ok" from a seizure standpoint. Tr. 693. Although the Amerge may have helped the headaches, Dr. Sumrall also recommended follow-up with palliative medicine to assist with pain management. Tr. 693. She also noted that a new therapist and counseling would be set up with the assistance of palliative medicine, and that the Prozac dosage had been increased to 30 mg daily. Tr. 693. Finally, Dr. Sumrall noted that Plaintiff "requested documentation for disability qualification. We will assess after MRI." Tr. 693.

The May 6, 2015 brain MRI noted no significant change. Tr. 751. A July 17, 2015 brain MRI indicated "interval development of a subcentimeter region of enhancement" in the otherwise stable tumor, with further short-term follow-up recommended to determine if it was granulation tissue from the prior biopsy as opposed to a change or progression of the tumor itself. Tr. 731. A September 11, 2015 brain MRI indicated that the lesion remained the same, and the previously seen "small focus of enhancement in the lesion is either less conspicuous or resolved." Tr. 778. A December 28, 2015 brain MRI was stable. Tr. 777. A March 25, 2016 brain MRI indicated a stable frontal lobe mass. Tr. 1053.

On March 29, 2016, Dr. Sumrall noted that Plaintiff was being prescribed Fioricet, but continued to have headaches, which were occurring mostly in the afternoons and evenings. Tr. 1029. Plaintiff reported a headache at the appointment, which has started the night before and continued despite taking Fioricet. Tr. 1029. Dr. Sumrall noted Plaintiff "seems to be leaning to one side w[ith] walking." Tr. 1029. Plaintiff denied having any seizures. Tr. 1029.

On July 19, 2016, Dr. Sumrall noted Dr. Richter[8] had substituted Cymbalta for Prozac. Tr. 1026. Dr. Sumrall noted Fioricet had not helped Plaintiff's headaches and prescribed Percocet up to four times a day instead; Dr. Sumrall noted the headaches were "better with Percocet" although Plaintiff noted having headaches with "stress, worrying etc. bending over, standing up." Tr. 1026.

MRIs taken July 18 and December 5, 2016; and April 10 and July 31, 2017 indicated no changes in the brain, with a stable left frontal oligodendroglioma as compared to studies dating to 2013. Tr. 1045-49.

### ii.  Dr. Sumrall's opinions

On May 21, 2015, Dr. Sumrall wrote a letter to "whom it may concern" providing the following information:

> I see Laquita Simmons as a patient for an oliodendroglioma, which is a form of primary brain tumor. She was diagnosed with this illness in June 17, 2013 and had a craniotomy to remove part of the tumor. She has been monitored since then for progression of tumor. Briefly, she has been managed with systemic chemotherapy, immunotherapy external. She sees me every 4-8 weeks and receives surveillance MRI of the brain every few months.

> She has had continued headaches that have impacted her activities of daily living. She requires medications to manage these. I continue to monitor her for seizure activity, and she takes medication to prevent these. She is also experiencing depression for which she has been receiving psychotherapy and medical therapy. I have set her up with supportive care for management of her headaches as well as engaging her in a support group. I have emphasized the importance of continuation of psychotherapy.

---

[8] The record does not include treatment records from Dr. Richter. Elsewhere, Dr. Richter is referred to as providing Plaintiff with pain management. *See* Tr. 1174, 1186.

Although this is not a quickly growing cancer, it is a chronic, incurable condition.
I am happy to provide additional details if needed.

Tr. 788.

In a June 2, 2016 letter addressed "To whom it may concern," Dr. Sumrall reiterated that

Plaintiff continued under her care for her oligodendroglioma that was diagnosed in 2013." Tr. 790.

Dr. Sumrall noted Plaintiff was "under observation" but "does suffer side effects from this tumor.

Unfortunately, this diagnosis is terminal. At some point the tumor will grow again and patient may

need treatment." Tr. 790.

iii.  Treatment by physician Keith W. Lackey, M.D.

Plaintiff saw Keith Lackey, M.D. on June 5, 2015 for what he indicated was a follow-up

visit.[9] Plaintiff reported that her "mood has been down. Feels like she needs her Prozac increased

to a total of 30 mg daily." Tr. 686. She informed Dr. Lackey that her neurologist noted some

enlargement on the May MRI and has a follow-up MRI scheduled, but needs to have a

hysterectomy first. Tr. 696. Plaintiff reported headache and "anxiety/worsening depression." Tr.

687.

On September 14, 2015, Plaintiff reported to Dr. Lackey that she was "doing well"

"overall." Tr. 760. Plaintiff continued to complain of headache and anxiety/depression. Tr. 761.

On December 14, 2015, Plaintiff reported to Dr. Lackey that her "[m]emory is becoming

an issue." Tr. 757. Plaintiff again noted headaches and "anxiety/depression." Tr. 758. Medications

were continued. Tr. 759.

On August 2, 2016, Plaintiff advised Dr. Lackey that she had been "having mini seizures"

and was following up with neurosurgery. Tr. 1183. She reported a headache and anxiety and

_____

[9] The parties do not point to record evidence from Dr. Lackey prior to June 5, 2015. However,
Plaintiff testified that she had been seeing Dr. Lackey since her tumor surgery. Tr. 828.

depression during the examination. Tr. 1185. Dr. Lackey noted Plaintiff's anxiety state was "worse" and her headaches were worsening; he recommended Plaintiff follow up with specialists (Dr. Richter for pain management as to headaches; psychiatry as to anxiety). Tr. 1185-86.

On November 2, 2016, Plaintiff reported her seizures were stable; Dr. Lackey again noted her headaches were worsening and recommended follow up with specialists. Tr. 1180, 1182.

On May 1, 2017, Plaintiff reported she was no longer seeing Dr. Richter for pain management and asked Dr. Lackey to take over the prescription of Percocet for her headaches. Tr. 1174. Plaintiff indicated that the phentermine prescribed for weight loss made her too anxious, and she "is now going to the gym." Tr. 1174. Dr. Lackey noted Plaintiff complained of headache and anxiety/depression; he diagnosed "[c]hronic intractable headache, unspecified" and continued Percocet 5-325 mg as needed. Tr. 1175-76. On August 14 and November 14, 2017, Dr. Lackey noted Plaintiff had a headache at both appointments as well as anxiety/depression; he continued to prescribe Percocet. Tr. 1169-70, 1172-73.

On February 14, 2018, Dr. Lackey noted Plaintiff had a headache and increased anxiety at the appointment; Plaintiff continued on Percocet. Tr. 1165-67. On May 23, 2018, Dr. Lackey noted Plaintiff had a headache at the appointments and continued her on Percocet. He assessed Plaintiff with "worsening headaches." Tr. 1163-64. Plaintiff indicated she had a headache at her appointments on August 23, 2018, November 19, 2018, and February 18, 2019. Dr. Lackey continued to prescribe Percocet for the headaches. Tr. 1153-54,1157-58, 1160-61.

iv.  Dr. Lackey's opinion

In a letter dated April 4, 2019, Dr. Lackey indicated he was Plaintiff's primary care provider and was "familiar with her treatment provided by the specialists." Tr. 1204. Dr. Lackey continued as follows:

> Plaintiff has a history of frequent migraine headaches which occur 2-3 times per week. Her migraine headaches are severe and associated with nausea and dizziness. They require her to lie down and take prescription pain medication for relief. It takes several hours before she can return to a baseline level of activity. The onset of these migraines is not predictable. Her symptoms are consistent with her history of surgery for a brain tumor in June of 2013.

Tr. 1204. Dr. Lackey opined Plaintiff "has not been able to sustain the physical and or mental demands of work at any level of skill or physical exertion on a regular and continuing basis" since she last worked in March 2014. Tr. 1204.

v.   Treatment by Neuro-oncologist David Cachia, M.D.

Although the record does not contain an opinion from treating neuro-oncologist David Cachia, M.D., the court includes a summary of his treatment records for completeness in considering Plaintiff's arguments. Dr. Cachia began treating Plaintiff on May 7, 2018. Tr. 1064. At that initial appointment, Plaintiff reported fatigue, and noted an episode of expressive aphasia while having a headache, which Dr. Cachia found "could certainly be suggestive of a focal seizure." Tr. 1064-65, 1067. Plaintiff's seizure medication (Keppra) dosage was increased from 500 mg twice daily to 750 mg twice daily. Dr. Cachia recommended Plaintiff receive treatment for her anxiety. Tr. 1067. On June 4, 2018, Plaintiff again reported fatigue, and Dr. Cachia noted she had no more seizures with the increased Keppra dosage and was "clinically and radiographically stable. There has been a slight increase in the size of the non enhancing mass when compared to more remote studies eg 2015 but changes are subtle." Tr. 1060, 1063.

June 4 and September 17, 2018 brain MRIs noted no significant change in the frontal lobe mass. Tr. 1069-73.

On September 17, 2018, Dr. Cachia noted Plaintiff "[s]till [complains of] headaches that are worse in the morning, associated with some photophobia" and worsened by stress. Tr. 1056. Plaintiff "denie[d] any particular relieving factors." *Id.* Plaintiff reported fatigue. Tr. 1057. Dr.

Cachia noted on examination that Plaintiff "also has evidence of tension headaches for which she has been prescribed percocet and oxycodone. Recommend trying to come slowly off these medications and try instead exercise, relaxation techniques." Tr. 1059. He noted Plaintiff was in treatment with a psychologist, and "[i]f headaches persist, might try depakote vs topamax for headache prophylaxis." Tr. 1059.

A January 14, 2019 brain MRI noted a stable mass, and Dr. Cachia noted Plaintiff had no new symptoms and remained clinically and radiographically stable. Tr. 1198-1203.

### b.   One-time-examining consulting sources

The record includes reports from several sources who examined Plaintiff one time, either at the request of Plaintiff (through her attorney) or the Commissioner (through the state agency).

### i.   Gordon Teichner, Ph.D.

On January 11, 2019, neuropsychologist Dr. Teichner saw Plaintiff for a neuropsychological assessment, apparently at the request of Plaintiff's counsel. Tr. 1108. Dr. Teichner's evaluation included reviewing Plaintiff's medical records, administering numerous tests, and examining her. Tr. 1107-51. Dr. Teichner issued a narrative report, which included completed forms setting out opinions regarding Plaintiff's mental impairments and functional limitations relevant to the Social Security disability assessment criteria. *Id.* After examining Plaintiff, Dr. Teichner noted, "[a]ttention and concentration weaknesses were apparent" and Plaintiff's "mood was anxious and depressed" with a congruent affect. Tr. 1111. Dr. Teichner's report includes a summary of the results of the 18 tests he administered. Tr. 1110-17. Dr. Teichner diagnosed mild neurocognitive disorder due to oligodendroglioma (brain tumor) and craniotomy/partial tumor resection; seizure disorder; migraine headache; major depressive disorder, recurrent, severe without psychotic features; generalized anxiety disorder; panic disorder;

agoraphobia; and unspecified personality disorder (paranoid and borderline personality disorder traits). Tr. 1117. Dr. Teichner provided several paragraphs in conclusion, including the following:

> [Plaintiff] demonstrates an abnormal neuropsychological profile. . . . Her neurocognitive profile reflects probable cortical and subcortical frontal lobe deficits. Such findings are not surprising given the presence of an oligodendroglioma in this region, and due to the fact that she underwent a partial resection of this oligodendroglioma in 2013. . . .
>
> By definition (DSM-5 / ICD-10) these neurological deficits are consistent with a diagnosis of a Mild Neurocognitive Disorder. The probable etiologies accounting for this neurocognitive disorder include the [oligodendroglioma and partial tumor resection] performed in 2013. Unfortunately, this cognitive dysfunction is probably permanent when considering the nature of the neurological insult, ongoing presence of this slow-growing tumor, and the amount of time that has transpired since this partial tumor resection.
>
> [Plaintiff] concurrently demonstrates a number of severe psychiatric challenges. At the forefront is extremely problematic depression which has been treatment resistant. She continues to demonstrate severe depression (i.e., a Major Depressive Disorder) even though she has pursued multiple and appropriate psychotropic medication trials.
>
> Her second area of psychological challenge pertains to very problematic anxiety. Such anxiety has also been treatment resistant. . . . She also demonstrates very problematic panic attacks (i.e., Panic Disorder) and a diagnosis of mild Agoraphobia.
> . . . .
>
> Examination results reflect a range of functional deficits. Due to the combined effects of her physical and psychiatric conditions, she demonstrates very poor stamina and persistence. . . .
>
> Within a reasonable degree of neuropsychological certainty, it is my professional opinion that [Plaintiff] is permanently disabled. This is due to the combined effects of these neurocognitive (neurological) and psychological disorders that she demonstrates. In turn, these conditions have resulted in functional work deficits. No medical treatments are available to improve her neurocognitive abilities. . . .

Tr. 1117-18.

Dr. Teichner's evaluation report included a response to a questionnaire regarding Listings 12.02, 12.04, 12.06, and 12.08, noting that the criteria for all four listed impairments were met, including the presence of "marked" functional limitations. *See* 20 C.F.R. § 404, Subpart P,

Appendix 1, Listings 12.02, 12.04, 12.06, and 12.08. Tr. 1124, 1134. Dr. Teichner also completed a form regarding Ms. Simmons' mental functional limitations, opining that Ms. Simmons was either markedly or moderately impaired in all 20 specified areas of work-related mental functioning. Tr. 1135-39.

### ii.   Temisan Etikerentse, M.D.

Plaintiff saw Temisan Etikerentse, M.D. on October 20, 2014, at the Commissioner's request. Tr. 420-23. Plaintiff reported anxiety and depression for the past year, and "chronic headaches for which [] she has been taking [] Motrin[.]" Tr. 421. Dr. Etikerentse noted that Plaintiff "cries all the time and the patient is crying in the office. When I asked things about the brain tumor, she cries . . . . She has seen a psychiatrist for 2 months, but presently on Zoloft and she said Zoloft is not helping . . . . She was scheduled to see another psychiatr[ist], but apparently insurance [is] not accepted by that physician group . . . ." Tr. 421. In the physical examination, Dr. Etikerentse noted central nervous system abnormalities for "[m]ood as mentioned. The patient is crying and severely depressed throughout the exam." Tr. 423. Dr. Etikerentse's assessment was: (1) "benign brain tumor.... oligodendroglioma with status post resection... has had chronic headaches as a result of that. She takes Motrin but I advised not to take that in light of history of peptic ulcer disease[;] (2) seizure disorder; stable on Keppra for the past year; (3) peptic ulcer disease; (4) "[s]ignificant depression.... definitely will benefit from psychiatric review." Tr. 423. He did not provide a functional assessment.

### iii.   Cashton Spivey, Ph.D.

On October 22, 2014, psychologist Cashton Spivey, Ph.D., examined and evaluated Plaintiff at the Commissioner's request. Tr. 424-29. Plaintiff reported that, subsequent to surgery for her brain tumor, she developed seizures (last seizure in July 2013), short-memory deficits, headaches, top-of-head numbness, as well as depression and anxiety. Tr. 425-26. Examples of the

memory deficits included forgetting to take medication, misplacing objects, and forgetting information in a conversation. Tr. 426. Despite taking Zoloft as prescribed, Plaintiff "did report significant feelings of dysphoria" in addition to sleep disturbance, fluctuating appetite, low energy level, attention/concentration problems, and recent crying spells, with generalized anxiety and ruminations. Tr. 426. Regarding her activities, Plaintiff informed Dr. Spivey that she does the dishes, laundry, makes the bed, sweeps, attends church, watches television, and will "walk her neighborhood block," but her mother performs the grocery shopping. Tr. 426.

Upon examination, Dr. Spivey noted that Plaintiff's "mood was sad and her affect was slightly blunted . . . attention/concentration functioning ranged from fair to good. . . [and] engaged in minimal eye contact." Tr. 427. Dr. Spivey reported a full scale IQ of 77, and Dr. Spivey opined that Plaintiff "appears to be an individual who operates primarily in the borderline intellectual range." Tr. 427-28. Dr. Spivey opined that Plaintiff "met the criteria for the following diagnoses: (1) Major depressive disorder; (2) Unspecified anxiety disorder; (3) Probable neurocognitive disorder due to brain tumor/neurosurgery (borderline intellectual functioning)." Tr. 428. Regarding functional limitations, Dr. Spivey opined that:

> Ms. Simmons is currently performing certain household duties and chores independently. She would be capable of understanding simple instructions and performing simple tasks in the workplace. She would display difficulty understanding complex instructions and performing complex tasks in the workplace. This assessment is based primarily on her Full Scale IQ score on the WAIS-IV falling in the borderline range. She would currently display difficulty relating well to others in the workplace due to the magnitude of her reported dysphoria.
>
> She would display difficulty with stamina and persistence in the workplace due to her report of a low energy level, and attention/concentration problems.

Tr. 428-29.

iv.  Mark McClain, Ph.D.

On February 19, 2015, psychologist Mark McClain, Ph.D. performed a mental status examination of Plaintiff at the Commissioner's request. Tr. 674-79. Dr. McClain's report indicated Plaintiff indicated she had stopped working in May 2014 after having had a seizure and having been diagnosed with a brain tumor in July 2013. The tumor was removed in July 2013, and Plaintiff returned to work. However, she had another seizure and was "experiencing significant memory problems and an inability to concentrate. She stated that she could not remember how to do job tasks which interfered with her ability to meet job expectations." Tr. 675. Plaintiff explained she had not had issues with meeting job expectations prior to the surgery. Because she was unable to perform her job, she resigned in May 2014. Tr. 675.

Dr. McClain also noted that Plaintiff stated she was "able to care for her personal needs" and perform activities of daily living, and was able "to follow a 3-step direction when moving from the waiting area to my office." Tr. 675. He opined that Plaintiff appeared to be able to manage her finances independently. Tr. 676. He noted that Plaintiff was currently being prescribed Prozac for depressive symptoms and Xanax for anxiety symptoms. Tr. 676.

On examination Dr. McClain noted that Plaintiff exhibited a "restricted affect" but did not report significant symptoms of depression at the time of the examination. Tr. 676. Plaintiff indicated that she was doing "okay" that day but noted her depression "generally comes and goes." Tr. 676. She reported that she usually will experience depression every other day. She indicated that she "will experience 4 or 5 days of depression out of 7 during [an] average week." Tr. 676. Plaintiff also reported anxiety about having another seizure as well as worry about her health and finances. Tr. 676. Dr. McClain noted Plaintiff's prior overdose of prescription medication and her inpatient psychiatric hospitalization after that suicide attempt. Tr. 676. Dr. McClain noted Plaintiff

22

described her depression and anxiety symptoms as being "directly associated with her health situation and unemployment." Tr. 676.

Dr. McClain described Plaintiff's thought processes as "logical, coherent, and organized." Tr. 677. Plaintiff "reported experiencing panic attacks, as evidenced by discrete periods of extremely high anxiety accompanied by difficulty breathing, muscle tightness, racing thoughts, and rapid heartbeat... she will experience panic attacks on a daily basis." Tr. 677. She indicated her last panic attack had occurred a week prior to the assessment. Tr. 677.

Dr. McClain's diagnostic impression was adjustment disorder with mixed anxiety and depressed mood (chronic stressors) and panic disorder. Tr. 677. He noted that Plaintiff was "currently reporting significant symptoms of depressed mood and anxiety which are directly associated with her health issues, unemployment, and financial stress." Tr. 677. Dr. McClain noted Plaintiff had been "unsure as to whether she experienced depression prior to the brain surgery." Tr. 678.

Dr. McClain's clinical functional assessment noted Plaintiff had presented to the evaluation well dressed and groomed and presented as being able to perform personal grooming independently. Tr. 678. He noted Plaintiff was able to perform a full range of household chores and had good communication skills, although she was "somewhat subdued during the assessment." Tr. 678. Regarding concentration, persistence and pace, Dr. McClain noted that Plaintiff "indicated that she is experiencing significant concentration problems, which interfere with her ability to stay with the tasks and complete them" although she was "not exhibiting cognitive deficits". Tr. 678. Dr. McClain also noted:

> She stated that after her surgery, she had problems concentrating and it took her much longer to complete tasks than before. She also had problems keeping up with others. She also reported that she started making mistakes following the surgery. . . . She reported significant problems after the tumor and stated that she frequently has to ask questions over and over in order to figure out what she needs to do. This

23

would suggest that she is experiencing difficulty understanding and focusing on complex tasks in a work setting.

Tr. 678.

c.     Non-examining RFC assessments

Non-examining state agency medical consultants reviewed the evidence available and completed assessments. In November 2014, Holly Hadley, Psy.D. opined that Plaintiff did not meet a mental impairment listed under 20 C.F.R. Part 404 Subpart P, App. 1 (the Listings). Tr. 66-67. Dr. Hadley  opined that Plaintiff could perform simple work tasks in a setting that "does not require ongoing interaction with the public," that she "may miss an occasional day of work secondary to her symptoms", and was able to "adapt to routine changes in the workplace." Tr. 72. Dr. Hadley indicated she had reviewed and given "great weight" to Dr. Spivey's October 22, 2014 Consultative Evaluation findings, Tr. 67; however, Dr. Hadley further indicated there was "no indication that there is opinion evidence from any source." Tr. 72. On November 5, 2014, Cleve Hutson, M.D., opined that Plaintiff had no exertional limitations, and could frequently perform postural movements with no exposure to hazards. Tr. 68-70. In the "RFC-additional explanation" section of the form Dr. Hutson noted Plaintiff had "[a]llege[d] headaches with standing, squatting, bending Can't walk far 10 minutes rest before resuming." Tr. 70. Dr. Hutson indicated Plaintiff's allegations were "partially supported in the longitudinal record with exam imaging studies and surgery." Tr. 70.

In the March 2015 assessment, Michael Neboschick, Ph.D. and Mary Lang, M.D., agreed with Dr. Hadley's and Dr. Hutson's respective prior assessments. Tr. 102, 104, 116. The reassessment also considered the evaluation by Dr. McClain, but no medical source opinions regarding limitations was available. Tr. 104.

2.      The ALJ's consideration of the opinion evidence

The ALJ noted there was opinion evidence that included "judgments about the nature and severity of the impairments and resulting limitations, from [Plaintiff's] treating physicians, evaluating physicians, and the state agency medical consultants." Tr. 806.

a.   Consideration of opinions of treating physicians Dr. Sumrall and Dr. Lackey

The ALJ considered Dr. Sumrall's May 2015 opinion that Plaintiff's headaches "have impacted her activities of daily living[]" and her noting the brain tumor is a "chronic, incurable condition." Tr. 806. The ALJ also acknowledged Dr. Sumrall's June 2016 report that Plaintiff "suffers from tumor side effects" and that the tumor "will grow again and [Plaintiff] will require treatment." Tr. 806 (citing exs. 21F and 22F). In relevant part, the ALJ found the following:

> Although I note that Dr. Sumrall was one of the claimant's treating physicians, I accord this opinion little weight as it is not supported by the treatment notes of record. In regards to the claimant's headaches, treatment notes showed that medications alleviated the claimant's headache pain. While early records showed inconsistent pain relief with over-the counter medications and Fioricet, later treatment notes since 2016 showed that the claimant's headache pain responded well to Percocet. (Exhibits 4F, 5F, 16, 19F, 23F-25F, and 28 F). Furthermore, all of the claimant's postoperative brain MRIs showed a stable appearance to the tumor without any appreciable changes. While there was a very subtle increase in the tumor size, the claimant's tumor-related symptoms did not worsen. Specifically, treatment notes show that her seizure disorder was well controlled with Keppra and her headache pain was alleviated with Percocet. Furthermore, the neurological evaluations of record remained normal. (Exhibits 4F, 5F, 13F, 18F, 20F, 24F, 25F, 28F, and 29F). Such evidence is inconsistent with Dr. Sumrall's opinion.

Tr. 806-07.

The ALJ also considered Dr. Lackey's April 2019 opinion that Plaintiff "has not been able to sustain the physical and or mental demands of work at any level or skill or physical exertion on a regular and continuing basis since March 2014 due to her headaches." Tr. 807 (citing ex. 30F). The ALJ gave this opinion "little weight, as it is not supported by the treatment records, which showed that the claimant's headache pain improved with Percocet." *Id*. (citing exs. 23F-25F and

28F). The ALJ noted decisions regarding whether one is disabled or unable to work are reserved for the Commissioner. *Id.*

### 3. The ALJ's consideration of other opinion evidence

The ALJ referenced the October 2014 of one-time evaluating, consulting psychologist Dr. Spivey, giving it "great weight by restricting [Plaintiff] to understanding, remembering, and carrying out simple instructions with ongoing public interaction." Tr. 806. The ALJ noted Dr. Spivey opined Plaintiff "would display difficulty with stamina and persistence in the workplace due to the magnitude of her reported dysphoria" and her "report of a low energy level, and attention concentration problems." Tr. 806. The ALJ noted, though, that the "limitation regarding stamina is outside [Dr. Spivey's] expertise and the limitation regarding persistence in inconsistent with his exam findings and the record as a whole." He noted that Dr. Spivey's opinion is "otherwise consistent with the claimant's mental status examination and test results. (Exhibit 7F)." Tr. 806.

The ALJ considered the February 2015 opinion of examining consultant Mark McClain, Ph.D. that Plaintiff "is able to perform normal activities of daily living and she would be able to manage her finances independently [and] would experience difficulty understanding and focusing on complex tasks in a work setting. (Exhibit 14F)." Tr. 806. The ALJ gave Dr. McClain's opinion "great weight by restricting [Plaintiff] to understanding, remembering, and carrying out only simple instructions[,]" even though the ALJ noted Dr. McClain "seemed to base his opinion on [Plaintiff's] subjective complaints." Tr. 806.

Characterizing the January 2019 opinion of consulting examiner Gordon Teichner, Ph.D. as one that Plaintiff is "permanently disabled due to the combined effects of her neurocognitive and psychological disorders" and "will never demonstrate sufficient capacity to gain and maintain any sort of meaningful employment[,]" the ALJ gave it "little weight." Tr. 807. The ALJ indicated Dr. Teichner's opinion was "not supported by the examination findings of record, which document

improved mental health symptoms with a stable medication regimen. (Exhibits 14F, 16F, 19F, 25F, 26F, and 28F)." Tr. 807. The ALJ also noted that statements regarding whether a claimant is disabled or cannot work are not given special significance by the Commissioner. Tr. 807.

Without providing much detail as to the opinions of the state agency medical and psychological consultants, the ALJ gave them "[g]reat weight" because they were "generally consistent with the evidence of record." Tr. 808.

The ALJ summarized his finding that Plaintiff was capable of work at all exertional levels, noting he had given the opinions of Doctors Spivey, McClain, and the state agency consultants "great weight." Tr. 808. He noted Plaintiff's "headaches, anxiety and depression," finding Plaintiff could "understand, remember, and carry out simple instructions but she must not have any ongoing public interaction." Tr. 808. Considering the "aforementioned inconsistencies, particularly the evidence that the claimant's symptoms improved with treatment, as well as the claimant's level of daily activity," the ALJ did not find Plaintiff's allegation that she was "incapable of all work activity consistent with the evidence." Tr. 808.

### 4.     The court's analysis of opinion evidence argument

If a treating source's medical opinion is "well-supported and 'not inconsistent' with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record).[10] As recently explained by the Fourth Circuit Court of Appeals,

> Section 404.1527(c)(2) sets out two rules an ALJ must follow when evaluating a medical opinion from a treating physician. First, it establishes the "treating

---

[10] Sections 404.1527 and 416.927 cited and discussed herein apply to claims filed before March 27, 2017. Plaintiff's claim under review was filed in 2014.

physician rule," under which the medical opinion of a treating physician is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also, e.g.*, *Arakas v. Comm'r of SSA*, 983 F.3d 83, 106–07 (4th Cir. 2020) (citing Section 404.1527(c)(2) and applying the treating physician rule); *Brown v. Comm'r of SSA*, 873 F.3d 251, 255–56 (4th Cir. 2017) (same). Second, if a medical opinion is not entitled to controlling weight under the treating physician rule, an ALJ must consider each of the following factors to determine the weight the opinion should be afforded: (1) the "[l]ength of the treatment relationship and the frequency of examination"; (2) the "[n]ature and extent of the treatment relationship"; (3) "[s]upportability," i.e., the extent to which the treating physician "presents relevant evidence to support [] medical opinion"; (4) "[c]onsistency," i.e., the extent to which the opinion is consistent with the evidence in the record; (5) the extent to which the treating physician is a specialist opining as to "issues related to his or her area of specialty"; and (6) any other factors raised by the parties "which tend to support or contradict the medical opinion." 20 C.F.R. § 404.1527(c)(2)(i)–(6).

*Dowling v. Comm'r of Soc. Sec. Admin.*, No. 19-2141, 2021 WL 203371, at *4 (4th Cir. Jan. 21, 2021). In *Dowling* the Court of Appeals noted that, although "an ALJ is not required to set forth a detailed factor-by-factor analysis in order to discount a medical opinion from a treating physician, it must nonetheless be apparent from the ALJ's decision that he meaningfully considered *each* of the factors before deciding how much weight to give the opinion." *Dowling*, 2021 WL 203371, at *5 (emphasis in original). The rationale for the general rule affording opinions of treating physicians greater weight is "because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Johnson*, 434 F.3d at 654 (quoting *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001)). The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro*, 270 F.3d at 176. SSR 96-2p requires that an unfavorable decision contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. In undertaking review of

the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence.

Similarly, the Commissioner generally gives "more weight to the medical opinion of a source who has examined [the claimant] than to the medical opinion of a medical source who has not examined [the claimant]." 20 C.F.R. § 404.1527(c)(1); 416.927(c)(1).

Having considered the ALJ's decision in view of these regulatory directives, the court finds that, once again, the ALJ failed to adequately consider the record evidence, particularly that of Plaintiff's complaints of lingering headaches and the 2015, 2016, and 2019 opinions of treating physicians Dr. Sumrall and Dr. Lackey regarding, *inter alia*, Plaintiff's headaches and their impact. Previously, the court remanded the matter because the records relied on by the ALJ "[did] not demonstrate that medications consistently alleviated Plaintiff's headache pain and frequency." Tr. 874-75 (referencing numerous medical records in which Plaintiff complained of headaches). Further, the court noted the ALJ had not explained "how the stable appearance of the tumor in MRIs is inconsistent with Dr. Sumrall's opinion." Tr. 874.

In considering Dr. Sumrall's treatment notes and opinions a second time the ALJ noted Dr. Sumrall's treating-physician status but discounted her opinion based on his determination that "later treatment notes since 2016 [the year of the first ALJ decision] showed that [Plaintiff's] headache pain responded well to Percocet. (Exhibits 4F, 5F, 16 F, 19F, 23F-25F, and 28F)." Tr. 807; *see* Tr. 806. In considering the opinion of treating physician Dr. Lackey, the ALJ did not expressly note his treating-physician status. The ALJ gave "little weight" to Dr. Lackey's opinion that Plaintiff's headaches had kept her from being able to "sustain the physical or mental demands of work at any level of skill or physician exertion on a regular or continuing basis since March 2014[.]" Tr. 807 (citing ex. 30F). The ALJ found the opinion unsupported by treatment records, which showed headache pain was "improved with Percocet." *Id.*

The court agrees with Plaintiff that the ALJ's consideration of the opinion evidence is again lacking. The ALJ fails to acknowledge an important part of Dr. Lackey's April 4, 2019 opinion. Dr. Lackey, Plaintiff's primary care physician, characterizes Plaintiff's headaches as severe and notes they "require her to lie down and take prescription pain medication for relief. It takes several hours before she can return to a baseline level of activity." Tr. 1204. This is consistent with Plaintiff's testimony. Tr. 823-24 (indicating that, after taking Motrin or prescription medication she has to "lie down for at least an hour" and that it takes half a day for her to be able to return to normal activities). Dr. Lackey also explains that Plaintiff's symptoms are "consistent with her history of surgery for a brain tumor in June of 2013." Tr. 1204.

The ALJ properly noted the ultimate decision as to disability is reserved for the Commissioner. However, the ALJ does not indicate how or whether he considered the portion of Dr. Lackey's opinion that explained that, even upon taking medication, Plaintiff must "lie down" and take "several hours" before returning to activity. Tr. 1204. The ALJ's general notation that Plaintiff's headache pain "improved with Percocet," Tr. 807, does not respond to Dr. Lackey's opinion that Plaintiff was unable to function until the medication took effect. Further, Dr. Lackey documented that Plaintiff's headaches were worsening, *see* Tr. 1164, and that she had headaches even during the clinical examinations, *e.g.*, Tr. 1153, 1157, 1160, 1163, 1169, 1172, 1175, 1182. The ALJ did not provide sufficient rationale for the rejection of Dr. Lackey's opinion. Further, the court is troubled that, in discounting Dr. Lackey's opinion, he made no mention of Dr. Lackey's long-term treatment of Plaintiff. *See Dowling*, 2021 WL 203371, at *4.

In reconsidering Dr. Sumrall's opinion, the ALJ again found it significant that the tumor had not increased in size. Tr. 807; *cf.* Tr. 30 (finding in first decision that the stable appearance of the brain tumor to be "inconsistent with Dr. [Sumrall's] opinion."). However, the relevance of the lack of increase in size is unclear, given that it is undisputed that the tumor was present and was

the cause of her headaches. Tr. 788. To the extent the ALJ is suggesting that the relative stability of the tumor's size post-brain-surgery is antithetical to debilitating headaches, the Fourth Circuit has repeatedly held that "while there must be objective medical evidence of some condition that could reasonably produce the pain, there need not be objective evidence of the pain itself or its intensity." *Arakas*, 983 F.3d at 95 (quoting *Walker v. Bowen*, 889 F.2d 47, 49).

At bottom, the Fourth Circuit recently characterized the treating physician rule as "a robust one" and explained that a treating physician's opinion "*must* be given controlling weight *unless* it is based on medically unacceptable clinical or laboratory diagnostic techniques or is *contradicted* by the other substantial evidence in the record." *Arakas,* 983 F.3d at 107 (emphasis in original) (citing *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987)). The ALJ's rejection of the opinions of long-time treating physicians Dr. Sumrall and Dr. Lackey is not supportable. The "other substantial evidence" on which the ALJ focuses—that Plaintiff's headache pain was eventually relieved by the use of a narcotic pain reliever—does not adequately explain his discounting of the opinions of the two opinion-providing sources who actually treated Plaintiff for years, nor does it account for Dr. Lackey's opinion that Plaintiff's severe headaches "require her to lie down and take prescription pain medication for relief[,]" which "takes several hours[.]" Tr. 1204.

The Commissioner's arguments to the contrary are unavailing. For example, the Commissioner argues that Dr. Sumrall's opinion was "not supported by the longitudinal evidence of record." Def. Br. 16. This argument is based on the findings of state agency psychologists Drs. Hadley and Neboschick who found Plaintiff had "only mild difficulties in relation to activities of daily living." Def. Br. 16 (citing Tr. 67, 98-99). Dr. Hadley's opinion, for example, is based only on a review of medical records through November 2014. At the time she offered her opinion she did not have the benefit of Dr. Sumrall's or Dr. Lackey's opinions. Further, the Commissioner's argument that Dr. Lackey's opinion "was contrary to the medical evidence showing that her

headaches significantly improved with medication," Def. Br. 17, is similarly unavailing. As noted above, that Plaintiff's headache symptoms may have improved hours after taking medication is not taking into account the evidence that Plaintiff's headaches debilitated her for approximately one-half of a day when she experienced them and took prescription medication to help alleviate the pain.

The court finds it appropriate to reverse and remand for further, expedited action by the Commissioner. The ALJ is to consider all evidence, including all opinion evidence, paying heed to the rule recently reiterated in *Dowling* that specific consideration must be given to all of the factors of 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). *See Dowling*, 2021 WL 203371. Further, as noted above, the ALJ's decision did not consider the nonexertional limitations brought about by her headaches and the time required for treatment thereof. On remand, the ALJ should procure evidence from a vocational expert in considering what impact those limitations have on Plaintiff's ability to work.

B.     Consideration of other issues

Because this matter is being remanded for consideration of the opinion evidence, particularly that regarding Plaintiff's headaches, the Commissioner is to further consider the other allegations of error raised by Plaintiff concerning her mental RFC and the consideration of Plaintiff's subjective allegations.

IV.     Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Plaintiff has requested that the court reverse the Commissioner's decision with instruction to order benefits, noting the remoteness of the time period and the available evidence.

Pl. Br. 45-50. "While the Court certainly has the authority under certain circumstances to reverse and award benefits, the preferred course is to reverse and allow the Commissioner to address the matter on remand." *Saxon v. Colvin*, No. CIV.A. 6:10-1144-RMG, 2013 WL 4051037, at \*4 (D.S.C. Aug. 9, 2013). Because this matter has been pending for over six years and has already been remanded once, the agency is directed to conduct an administrative hearing on remand and to issue a decision by the Administrative Law Judge within 90 days and a final agency decision within 120 days. While the court defers to the Commissioner regarding ALJ-assignment, the Commissioner is encouraged to assign this matter to a different ALJ. *Friend v. Saul*, No. 3:19-CV-00211 (KAD), 2020 WL 2475642, at \*7 (D. Conn. May 13, 2020) ("The Court does not require, but strongly encourages the Commissioner to assign a different ALJ to hear this matter on remand."). Should a further appeal to the district court be necessary, Plaintiff should designate this case as related on the Civil Cover Sheet. The court hereby reverses the decision of the Commissioner pursuant to Sentence Four of 42 U.S.C. § 405(g) and remands in accord with the instructions set forth above.

IT IS SO ORDERED.

February 3, 2021                                    Kaymani D. West
Florence, South Carolina                      United States Magistrate Judge